The judgment appealed from is therefore affirmed.

(81 South. 213)

No. 21507.

CRICHTON v. LOUISIANA OIL REFINING CO. et al.

(March 3, 1919.)

*(Syllabus by the Court.)*

CORPORATIONS ⬤125—TRANSFER OF STOCK— TITLE OF TRANSFEREE.

A certificate, showing the defendant H. to be the owner of 50 shares of the stock of the company named as codefendant, not having been indorsed by him, for transfer or otherwise, but having been deposited in a proper place, in his own office, for safe-keeping, and having thereafter been obtained by an unauthorized third person, through fraudulent misrepresentation, and by him delivered, in the condition above described, to the plaintiff, C., in discharge of his (H.'s) personal and pre-existing debt to C., it requires no citation of authority to sustain the conclusion that C. thereby acquired no title to the stock represented by the certificate, nor, under the circumstances, would he have acquired title if he had parted with value at the time, and in consideration, of the delivery of the certificate, since the person by whom the delivery was made had no title to convey and no authority from the owner to make either conveyance or delivery of the stock or certificate.

Appeal from First Judicial District Court, Parish of Caddo; John R. Land, Judge.

Action by Thomas Crichton against the Louisiana Oil Refining Company and Y. L. Holmes. Judgment for defendants, and plaintiff appeals. Affirmed.

L. K. Watkins, of Minden, and Hall & Jack, of Shreveport, for appellant.

Mabry & Foster, of Shreveport, for appellee Louisiana Oil Refining Co.

C. V. Ratcliff and Otis W. Bullock, both of Shreveport, for appellee Y. L. Holmes.

Statement of the Case.

MONROE, C. J. The facts disclosed by this record are as follows:

Plaintiff is a successful merchant and general operator, residing in Minden, and for some years prior to the month of September, 1914, was more or less aided in his outside operations by Albin Tompkins, who was also domiciled in Minden, but conducted, perhaps, the greater number of his business ventures in Shreveport, and was assisted in so doing by plaintiff, who advanced money to him, usually upon satisfactory security, but, at times, apparently without such security and with the ultimate result that in June and July, 1914, Tompkins owed him some thousands of dollars which, as it turned out, a little later, was very poorly secured, or not secured at all. That being the situation, on June 30th, Tompkins executed a written instrument whereby he declared that, on the delivery by plaintiff to a certain bank of $2,000 for his (Tompkins') account, he promised to sell plaintiff, on or before July 4th, 32 shares of the stock of the Louisiana Oil Refining Company, at $87.50 per share; which would seem to have been rather a peculiar transaction, since, according to the evidence in the record, the stock thus referred to was selling, about that time, for $100 per share; and Y. L. Holmes (who, with the oil company, is made a defendant in this suit) bought $15,000 of it at that price. Tompkins had also done some busi-

ness in real estate, with Holmes (who lived in Shreveport and was pretty well known to him), and on August 17, 1914, he stated to Holmes that plaintiff wanted to buy some stock. Whereupon Holmes told him that he had 50 shares of the L. Oil Refining Company stock, and to "tell Mr. Crichton to come over" (from Minden to Shreveport) "on the 18th day," and his testimony was then interrupted, and he never returned to the point at which he left off. We gather, upon the whole, however, that he gave Tompkins to understand that he would sell his stock if Tompkins would find him a purchaser who would pay his price, which was $2 or $3 per share less than par. On the following day (August 18th), Holmes had occasion to absent himself from Shreveport, and did not return until the evening of that day. On the next day (August 19th), upon going to his place of business (which was the office of Ratcliff Bros., insurance and real estate agents, in which he had a desk, and the use of a compartment in an office safe), he found that his certificate for the stock in the oil company, which was issued in his name and was unindorsed by him, had disappeared from the place in which he had left it, and, making inquiry about it, received from H. R. Ratcliff, of Ratcliff Bros., the explanation embodied in the following testimony given by Mr. Ratcliff, to wit:

"Mr. Tompkins came into the office and told me that Mr. Holmes said to give him that stock certificate for $5,000 stock in the Louisiana Oil Refining Company, and I gave it to him."

Holmes testifies, without attempt at contradiction, that he had sent no such message, had not authorized Tompkins to get the certificate, and had not made him his agent to sell it; and Ratcliff testifies that he would not have given him the certificate but for the fact that it was not indorsed by Holmes and bore no authorization to transfer the stock.

Holmes thereupon telephoned to Tompkins (in Shreveport, as we understand), and, learning that he had delivered the certificate to plaintiff, telephoned to plaintiff. (It may here be remarked that plaintiff, in his testimony, denies that he received any such communication, but that the testimony of Holmes is corroborated by that of the manager of the telephone company, who testifies that the records of the company show that Holmes on that day put in a call for Mr. Crichton at Minden—whether Mr. Thomas Crichton, or not, he was unable to say— and that they talked over the phone; and it is not suggested that any other Crichton was found, or lived, in Minden.)

Holmes' version of the conversation over the phone, and what occurred shortly afterwards, is as follows:

"Q. I will ask you if you had occasion, on the 19th day of August, to call up Mr. Thomas Crichton, the plaintiff in this case? A. Yes, sir. Q. For what purpose did you call him? A. Well, the purpose was—I got information he held the certificate, and he said he would be over and pay me for it. When it went away, I could not understand that, and I phoned him, and he said he would be over that evening and pay me for it, and he would go up to the Louisiana Oil Refining Company's office and have it transferred; and that was on the 19th day of August. Q. Did he come? A. No, sir; he did not come. * * * A. Well, the next day was the 20th. I thought perhaps he would come to town, but I could not find him, and, on the 21st, the next day, I went over to see him at his office. * * * Q. What did you go for? A. Went for my stock. Q. Did you find it? A. Yes, sir. Q. State what was said by Mr. Crichton and yourself there in his office? A. Well, Mr. Crichton said that he was into it; he told me that he had bought the stock from Tompkins, and he said to me: 'Now, I know that it is not my stock, and I will give you the stock back, if you just won't say anything. My wife has been after me, and my friends have been after me, and, when you are playing with fire, you might expect to get burned.' That was the conversation. He told me that he would be up that afternoon and bring it over with him, and we could fix it up; but, still, he did not come. * * * Q. Who was present at the conversation, besides yourself and Mr. Crichton?

A. Mr. Fitzgerald. Q. Did you, at that time, explain that you had not authorized or delivered the stock to any one? A. Yes, sir; and I called his attention— Q. Did you call his attention to the fact that it had not been indorsed for transfer? A. Yes, sir. Q. He did not ask you to indorse it? A. No, sir."

Mr. Fitzgerald is spoken of in the testimony as a prominent and responsible man, but he was not called as a witness, and, though some perfunctory attempt in that direction is shown to have been made on behalf of plaintiff, we find nothing to satisfy the mind that his testimony could not readily have been obtained if it had really been wanted. Mr. Tompkins is shown to have disappeared about September 1st, leaving behind him an injurious rumor, and leaving in the hands of plaintiff some $6,000 of paper, as collateral security, which proved to be worse than worthless. Plaintiff himself gives the following with other testimony concerning Tompkins:

"Q. At the time you bought this 50 shares of stock, is it not a fact that you knew Albin Tompkins did not have a good reputation with all the people in general? A. He did not have with all. Q. You had, yourself, become somewhat suspicious? A. Well, I thought he was doing too much trading."

Plaintiff's bookkeeper was called to the stand, and testified that plaintiff bought the stock from Tompkins; but, having, at the request of defendant's counsel, produced plaintiff's books, showing Tompkins' account, or so much of it as contained entries from July 10 to August 19, 1914, inclusive, it appeared therefrom that the stock had merely been credited against a pre-existing indebtedness (of Tompkins to plaintiff) as follows:

August 19 32½ shares La Oil Ref. stock at 87½ ............................ $2,843.75
17½ shares La Oil Ref. stock at 75 ............................ 1,312.50

Plaintiff gave some testimony to the effect that a debit item, reading, "Red River Bk. & T. Co. $1,011.67," represented a payment made by him for Tompkins' account on the day that the certificate was delivered; but, on the account as it appears in the record, the item bears no date, and the testimony fails to satisfy us that plaintiff parted with any money at the time that the certificate was delivered to him. In that and in all other respects, it is overborne by other testimony sustained by all the probabilities of the case. Holmes, not being able to get his certificate from plaintiff, advertised it as lost or stolen, and, in due time, obtained a duplicate from the company; and thereafter plaintiff brought this suit, alleging that he had bought "the stock from Holmes," through his duly authorized agent, "Albin Tompkins, who delivered said certificate * * * without the indorsement requisite for the transfer * ' * * but with the intent to transfer, * * * and such sale and delivery imposed upon the said Holmes an obligation to complete the transfer"; further alleging that the company had issued the duplicate certificate negligently and without authority, etc., and praying for judgment canceling the same, commanding Holmes to transfer the original, or, upon his failure so to do, decreeing the judgment to operate the transfer, and for judgment against the company ordering it to recognize him (plaintiff) as the owner of 50 shares of its stock, or, in the alternative, to pay $5,000 as damages. The case was tried before a jury, which brought in a verdict for defendants, which was confirmed by the court, and plaintiff has appealed.

## Opinion.

The certificate, showing the defendant Holmes to be the owner of 50 shares of the stock of the defendant Louisiana Oil Refining Company, not having been indorsed by him, for transfer or otherwise, but having been deposited in a proper place in his own office, for safe-keeping; having thereafter

been obtained by Tompkins, an unauthorized third person, without the consent or knowledge of the owner, and by fraudulent misrepresentation; and by him delivered, in the condition above described, to plaintiff, in discharge, or partial discharge, of his (Tompkins') personal and pre-existing debt to plaintiff—it requires no citation of authority to sustain the conclusion that plaintiff thereby acquired no title to the stock represented by the certificate; nor, under such circumstances, would he have acquired title if he had parted with value at the time, and in consideration, of the delivery to him of the certificate, since the person by whom the delivery was made had no title to convey, and no authority from the owner to make either conveyance of the stock or delivery of the certificate.

The judgment appealed from is therefore affirmed.